## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

### CASE NO. _____

| | |
|---|---|
| AMERICAN FOOD SYSTEMS, INC.; OLD ANDOVER RESTAURANT, INC., d/b/a GRASSFIELD'S FOOD & SPIRIT; OLD WALTHAM RESTAURANT, INC., d/b/a GRASSFIELD'S FOOD & SPIRIT; OLD ARLINGTON RESTAURANT, INC., d/b/a JIMMY'S STEER HOUSE; OLD SAUGUS RESTAURANT, INC., d/b/a JIMMY'S STEER HOUSE, OLD SHREWSBURY RESTAURANT, INC., d/b/a JIMMY'S TAVERN & GRILL; OLD LEXINGTON RESTAURANT, INC., d/b/a MARIO'S ITALIAN RESTAURANT, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| FIREMAN'S FUND INSURANCE COMPANY, and ALLIANZ GLOBAL RISKS UNITED STATES INSURANCE COMPANY, | ) ) ) ) ) |
| Defendants. | ) ) ) |

## <u>COMPLAINT</u>

### Introduction

This case is about whether Plaintiffs' insurance policy provides coverage for damages sustained and/or incurred expenses by Plaintiffs as a result of unprecedented emergency Orders by state and local officials of the Commonwealth of Massachusetts restricting Plaintiffs' on-premises business activities. The emergency Orders were intended to protect people and property from imminent serious and irreparable injury. A paginated copy of the Policy (with a Table of Contents) is attached hereto as Exhibit A.

Plaintiffs sue Defendants Fireman's Fund Insurance Company, and Allianz Global Risks United States Insurance Company, (hereinafter collectively referred to as "Defendants" or "Insurer"), and state:

## PARTIES

1.      American Food System, Inc., ("AFS") is a Massachusetts corporation located at 30 B. Street, Burlington, Massachusetts.  AFS is a Production/Distribution/Office for the affiliated restaurants identified in ¶ ¶ 2-7 *infra*:

2.      Old Andover Restaurant, Inc., a Massachusetts corporation, is an owner of Grassfield's Food & Spirit, a restaurant located at 207 N. Main Street, Andover, Massachusetts.

3.      Old Waltham Restaurant, Inc., a Massachusetts corporation, is an owner Grassfield's Food & Spirits, a restaurant located at 880 Lexington Street, Waltham, Massachusetts.

4.      Old Arlington Restaurant, Inc., a Massachusetts corporation, is an owner of Jimmy's Steer House, a restaurant located at 1095 Massachusetts Avenue, Arlington, Massachusetts.

5.      Old Saugus Restaurant, Inc., a Massachusetts corporation, is an owner of Jimmy's Steer House, a restaurant located at 114 Broadway, Saugus, Massachusetts.

6.      Old Shrewsbury Restaurant, Inc., a Massachusetts corporation, is an owner of Jimmy's Tavern & Grill, a restaurant located at 20 Boston Turnpike, Shrewsbury, Massachusetts.

7.      Old Lexington Restaurant, Inc., a Massachusetts corporation, is an owner of Mario's Italian Restaurant, a restaurant located at 1733 Massachusetts Avenue, Lexington, Massachusetts.

8.     Defendant Fireman's Fund Insurance Company (FFIC) is a California corporation with its principal place of business in Illinois. FFIC is part of the Allianz Group of companies and is authorized to conduct business in the Commonwealth of Massachusetts.

9.     Defendant Allianz Global Risks US Insurance Company (Allianz) is an Illinois corporation with its principal place of business in Illinois. Allianz, the world's largest property & casualty insurance company by revenue, is authorized to conduct business in the Commonwealth of Massachusetts.

10.     At all relevant times, FFIC and Allianz ("Defendants") insured the Plaintiffs' properties and their restaurant businesses.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.  Diversity exists between the Plaintiffs and Defendants and the amount in controversy exceeds $75,000, exclusive of interests and costs.

12.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because the events giving rise to Plaintiffs' claims occurred in this District and the insured property that is the subject of the action is situated in this District.

## FACTS

### I.     Plaintiffs' Insurance Policy

13.     Plaintiffs purchased commercial business-owners insurance policy # USC013049200 (the Policy) from Defendants on or before February 3, 2020.  Exhibit A hereto. [1] The Policy's effective dates are from February 3, 2020 through February 3, 2021.  The Policy

---

[1]  Exhibit A is the Policy, with a Table of Contents and page numbers, prepared by Plaintiffs' counsel for the convenience of the Court.

insured Plaintiffs' restaurant businesses and properties where they operate, and the distribution, office, and production premises.  Plaintiffs hereby incorporate the Policy (Exhibit A) in this Complaint.

14.     The Policy is an all-risk commercial property insurance policy that provides coverage for physical loss of or damage to the insured property from all risks unless expressly limited or excluded by language in the body of the Policy or through a separate exclusion endorsement.

15.     The Policy includes coverages for business income losses and incurred extra expenses from all risks including for civil authority actions.

16.     The Policy provides blanket coverage limits of $6,863,000 for business income losses for all Plaintiffs and all business locations identified in ¶ ¶ 1- 7.

17.     There is no exclusion in the Policy for business income losses and incurred extra expenses caused by emergency Orders restricting Plaintiffs' business activities at their insured properties.

18.     The Policy sold by Defendants to Plaintiffs', like all insurance policies, must be read as a whole.

19.     The Defendants have numerous duties under the insurance contract, statutes. and common law including (but not limited to) answering insured questions regarding coverage, receiving loss notices, investigating and assessing claims, paying claims, or issuing declination of coverage (when applicable).

20.     All conditions precedent to this action have been performed or have been waived.

**II.     State and Local Emergency Orders**

21.     It is no secret that the world is in the midst of a pandemic.  When it became apparent that the mere publicity around COVID-19 would not naturally facilitate voluntary strict social distancing and curtailing of social-gathering business operations (such as restaurants), state and local authorities intervened through a series of emergency Orders.

22.     Commencing on March 13, 2020 and continuing to the present, Massachusetts Governor Charlie Baker issued of a series of Executive Orders designed to prevent and limit the spread in the Commonwealth of COVID 19, a worldwide pandemic virus.  The March 13, 2020 Order prohibited the gathering of more than two-hundred fifty people.

23.     On March 15, 2020, Governor Baker further ordered restaurants to cease on-premises consumption of food or drink.  The Order further required no gathering of more than twenty-five people.

24.     On March 23, 2020, Governor Baker, with the support of the Department of Public Health, issued an Order requiring the mandated closure of businesses in the Commonwealth, effective March 24, 2020.  The Order provided as follows: "All businesses and other organizations that do not provide COVID-19 Essential Services shall close their physical workplaces and facilities ("brick-and-mortar premises") to workers, customers, and the public as of 12:00 noon on March 24, 2020 and shall not re-open to workers, customers, or the public before 12:00 noon on April 7, 2020."  The Order further limited gatherings of ten or more people, rescinding a previous March 15, 2020 Order that limited on-premises consumption of food and gatherings of more than twenty-five people.  Subsequent Orders prohibited non-essential business operations, including Plaintiffs' operations until subsequent dates, i.e., after June 1, 2020.

25.     These Orders were intended to protect people and property from imminent substantial harm.

26.     For the most part (including those causing Plaintiffs' losses), the emergency Orders were issued pursuant to an executive's emergency powers.  They were not the result of the legislative or deliberative body's process typical of laws and regulations.

27.     Plaintiffs have complied with all Executive Orders issued by Governor Baker.

28.     The unprecedented emergency Orders affecting Plaintiffs were not a foregone conclusion or an obvious consequence of the COVID-19 pandemic, as evidenced by the variations among states and localities as to the types and extent of restrictions placed on businesses and public activities.

29.     A national debate has erupted concerning the Orders' necessity, appropriateness, breadth and length, with some high-profile federal and state officials even questioning the motivation behind them.

### III.     The Plaintiffs' Restaurant Business Activities

30.     Plaintiffs' businesses consist of family-style and business restaurants, all located throughout the Commonwealth of Massachusetts.  Plaintiffs have faithfully served Massachusetts communities for decades.

31.      Plaintiffs own and/or operate a consortium of favorite local restaurants, including "Grassfields" in Andover and Waltham: "Jimmy's Steer House" in Arlington, and Saugus, "Jimmy's Bar & Grill" in Shrewsbury; and "Mario's" in Lexington.  Plaintiff AFS utilizes a location in Burlington as its production, office and/or distribution facility. .

32.     All of Plaintiffs' restaurants, with the exception of Mario's in Lexington, derive most of their business from on-premises operations: dining and table service.  Prior to the Orders, Mario's derived its business at an approximate 50% on-premises/50% take-out.

33.     The restaurants typically serve lunch, dinner, and alcohol beverages, attracting family, business, and social oriented patrons.

34.     Plaintiffs' business activities include, *inter alia*, the procurement, preparation, and sale of food and beverage items; the management and training of employees, marketing, accounting, and the maintenance of physical structures and equipment.

35.     Plaintiffs' business activities include various services they provide to their customers, including, *inter alia*, on-premises dining and table service, delivery service, take-out service, and special function events.

36.     The customer appeal of Plaintiffs' restaurant and bar venues, rests in part, with the experience offered to their customers.

37.     These services are the business of the Plaintiffs.

38.     While grocers or retailers may provide a simple location for customers to purchase ready-to-eat food, beverages, Plaintiffs offer something more: a dining experience, which depends on the availability and essential functionality of the Plaintiffs' insured properties.

**IV.     Plaintiffs' Losses – The Devastating Slowdown and/or Cessation of their Businesses**

39.     Beginning in March 2020, Plaintiffs were forced to severely restrict the services they could provide at their insured properties as a result of the emergency Orders described herein.

40.     To comply with the emergency Orders, Plaintiffs were required to slow down and eventually cease their business activities, most importantly the provisions of on-premises dining and alcohol service.

41.     When Plaintiffs closed their restaurant operations, they suffered losses of food and perishable inventories.

42.     Beginning on March 15, 2020 and continuing through various phases of re-opening (as authorized by revised Orders), Plaintiffs were not permitted to provide on-premises dining and bar services, operating in some situations only with takeout and delivery services.  During such times, Plaintiffs' restaurants operated with substantially diminished revenues at each of their locations.  After June 8, 2020 (re-opening Phase 2), Plaintiffs operated only with limited capacity on-premises dining.

43.     At present, Plaintiffs' restaurants are still operating with limited on-premises food and beverage services.

44.     In addition, Plaintiffs have incurred costs and expenses, including but not limited to: cleaning needed at their premises, supplies such as plexi-glass, paper menus and other modifications.

45.     As a direct result of the emergency Orders issued by Governor Baker to mitigate risk of physical harm to people and property, Plaintiffs have suffered a physical loss of or damage to their insured properties for regular business operations.

46.     Specifically, Plaintiffs lost the ability to provide restaurant, alcohol, and sales at their insured properties, were denied access to the insured properties to provide restaurant, alcohol and sales at their insured properties, their customers were prevented from physically occupying their insured properties, their customers were prevented from physically occupying their insured properties, causing the insured properties to be physically uninhabitable and unusable by employees and customers, causing Plaintiffs' core business functions to be nearly eliminated or destroyed, all of which caused and constituted a suspension of Plaintiffs' business operations at their insured properties.

47.     This loss of Plaintiffs' insured properties caused Plaintiffs to suffer substantial business income losses and incurred extra expenses for renovations, cleaning, training and restocking.

48.     But for the emergency Orders, Plaintiffs would not have suffered such economic business income losses or incurred such extra expenses.

49.     Plaintiffs' business income losses and incurred extra expenses at their insured properties have continued through the date of filing of this action.

50.     Plaintiffs' actions were reasonable and necessary to comply with the various Orders and to mitigate the damages described herein.

51.     Plaintiffs' causes of loss are not excluded by the Policy.

52.     Plaintiffs have suffered substantial losses of insured business income and have incurred insured expenses caused by insured causes of loss within the terms and conditions of the Policy.

### V.      Background to Business Interruption Insurance

53.     At its core, business interruption insurance (or "business income" insurance as it is known today) ("BI") is meant to return an insured's business the amount of profit it would have earned had there been no interruption of business or suspension of operations.   To assist an understanding of BI's context and coverage in the Plaintiffs' Policy (read as a whole), Plaintiffs offer the following factual background allegations.

54.     BI was developed in the United Kingdom in the early 19th century as a supplement to fire insurance.   Insurers would compensate commercial building owners not only for the physical damage but for the insured's inability to utilize the building to collect rent (the primary

business of the insured).  The first "loss of rent" coverage was offered by the English Hamburg Fire Office in 1817.

55.     BI continued to evolve, and by the mid-19th century insurers in Europe began offering "stoppage or cessation" insurance, that provided coverage for business income losses due to the inability to utilize property.  Typically, such insurance offered a fixed percentage of what a company's stock on hand would have generated for business income.

56.     By the late 19th century, BI had come to the United States. In 1880, Boston-based insurer Dalton introduced "Use and Occupancy" insurance.  This coverage insured the loss of production following a covered peril.  Typically, the policy provided for a set dollar amount of recovery for each day the insured was prevented from conducting business operations.  "Use and Occupancy" continued to be the nomenclature adopted by American insurers up until the 1940s.

57.     In the late 1930s, insurers began offering "Gross Earnings" insurance.  This was an iteration of BI which compensated insureds for the reduction in gross earnings due to a business interruption caused by a covered peril.

58.     In 1986, the Insurance Services Office ("ISO") recommended replacing the "Gross Earnings" policy form with the "Business Income Coverage" form.  This form is used today, with various modifications.

59.     The coverage in certain policies, such as Plaintiffs', is tied to the insured's interest in its income stream.  This coverage protects an insured's business losses when occurring in accordance with the policy language concerning covered causes of loss.

60.     Though it has evolved over centuries, the crux of BI insurance has always been to return to insureds (such as Plaintiffs') the losses of business income resulting from the slowdown or cessation of their business.

**VI.     Plaintiffs Purchased Insurance for their Businesses, Not Just their Buildings**

61.     In order to protect their insured properties, businesses, and business income from losses, Plaintiffs purchased the insurance policy sold by FFIC.  Upon information and belief, FFIC is owned by Allianz.

62.     At all relevant times, the Policy was in full effect as Plaintiffs paid the six-figure premiums due which Defendants accepted.  Plaintiffs have been insured by the Defendants for the last several years, paying the required premiums annually.

63.     At all times, Plaintiffs have relied on Defendants' promises to cover their insureds' business income losses and extra expenses caused by such losses.

64.     The premium Plaintiffs paid included coverages for, *inter alia*, buildings and personal property, business income and extra expense, off-premises special event cancellation, and commercial liability.  It also included additional coverage for "extended" business income, civil authority, delayed occupancy, expediting expenses, communicable disease, and loss adjustment expenses; and a special endorsements tailored to their type of business, i.e., Additional Covered Causes of Losses, Property-Gard Restaurant Extension, and/or Hospitality Extension endorsements.  The coverages are set forth in Ex. A.

**VII.     The Insurer's Duties**

65.     Plaintiffs, like others, purchased their insurance policy for business income protection caused by unforeseen disaster.

66.     During such times, individuals and businesses including Plaintiffs are vulnerable and dependent on the Defendants' promises of coverage, a fact of which insurance companies including Defendants have knowledge.

67.     Insurance companies promise, warrant and sell "peace of mind" that in the unlikely event of a catastrophe or disaster the policyholder will be fully and promptly protected.

68.     The contract of insurance carries with it a duty of utmost good faith on the part of the insurer because of the vulnerability of policyholders during and following an insured cause of loss.

69.     The Defendants' duties include but are not limited to Defendants' obligation to fairly and quickly adjust Plaintiffs' claims to determine coverage and amount of loss, adjust insurance claims, and provide prompt payment.

70.     In addition to a contractual duty, an insurer's duty of good faith and fair dealing exists under both Massachusetts common law and G. L. c. § 176D and G. L. c. 93A and regulations of the Commonwealth thereto.

71.     Here, Defendants failed to make a good faith investigation, determine coverage and adjust Plaintiffs' claims because Defendants reached a pre-determined conclusion to deny coverage.

72.     Defendants have adopted an arbitrary position to deny all business interruption claims like Plaintiffs' claims, despite different circumstances, different executive Orders, and differences in policies.  Defendants' website provides:

> In general, any standard property and business interruption coverage must be triggered by physical loss or damage to property at an insured location and infectious disease is usually not a covered peril.

Allianz, *Update in Response to COVID-19 – Claims Handling*,

https://www.agcs.allianz.com/news-and-insights/news/coronavirus.html#claims.  See also,

https://www.agcs.allianz.com/news-and-insights/news/coronavirus.html

73.     The Defendants' one-size-fits-all approach to their contractual, statutory and common law duties to act reasonably, in good faith to investigate claims, decide policy coverage,

and make claim adjustments has led to the improper denial of countless business interruption claims, including Plaintiffs'.

74.     Plaintiffs (like others who purchase business interruption insurance) have faithfully paid their premiums.   Yet, when Plaintiffs made a claim because of a catastrophic business interruption caused by state and local emergency Orders, the Defendants summarily and arbitrarily denied Plaintiffs' claims.   Plaintiffs (like many businesses) have relied on their business interruption insurance to cover what it is supposed to cover – replacement of business income and payment of ongoing expenses in order to rebuild their businesses.

75.     Accordingly, Plaintiffs bring this suit in response to Defendants' breach of their contractual obligations to pay Plaintiffs covered losses and properly adjust Plaintiffs' claims.

**VIII.   Policy Provisions Provide Coverage for Plaintiffs' Losses and Extra Expenses**

76.     The losses and expenses incurred by Plaintiffs' business operations are covered under various provisions of the Policy.

77.     The Policy is broadly organized into four parts: Property Coverage Declarations, a Property Coverage Form table of contents, the "Property-Gard Pinnacle Coverage Form" and all other property coverage forms (consisting of additional covered causes of loss, modifications, extensions, and endorsements).   The Policy must be read as a whole.

78.     The Policy provides coverage for certain property: physical buildings, personal property, and distinctly for business income and extra expense.

79.     With respect to the property forms and endorsements, the Policy has the following apparent limits:

    a.   Blanket limits for Business Real Property

        i.   Properties 1-5, 7-9: in the amount of $3,740,000;

ii.   Property 6: in the amount of $1,350,000.

b.   Blanket limits for Business Personal Property (Properties 1-5, 7-9) in the amount of $3,271,800;

c.   Blanket limits for Business Income and Extra Expense (Properties 1-5, 7-9) in the amount of $6,863,000.

80.   The Declarations also list a number of "Extensions of Coverage", each one with its own limit of insurance.  The Policy also contains various endorsements including Hospitality Extension and Restaurant Extension endorsements, which provide additional "Extensions of Coverage" in a number of areas, each with its own limit of insurance.

81.   As stated, the Policy is an all-risk commercial property insurance policy that provides coverage for physical loss of or damage to the insured property from all risks unless expressly limited or excluded by language in the body of the Policy or through a separate exclusion endorsement.  The Policy provides no definitions of these policy terms.

82.   There is no exclusion in Plaintiffs' Policy for the loss of business income caused by emergency Orders resulting in the physical loss of (or alternatively, damage to) Plaintiffs' properties.

83.   Plaintiffs' business interruption coverage provides for business income losses and incurred extra expense.  The Policy provides:

> "If a Limit of Insurance for Business Income and Extra Expense is shown in the Declarations, then we will pay for the actual loss of **business income** and necessary **extra expense** you sustain due to the necessary **suspension** of your **operations** during the **period of restoration** arising from direct physical loss or damage to property at a **location**, or within 1,000 feet of such **location,** caused by or resulting from a **covered cause of loss**.
>
> …
>
> "Business income" is defined in relevant part as "a. Business income means:

> (1) The net profit or loss before income taxes from your operations including: (a) The sales of merchandise or services; (b) The net sales value of manufacturing production;  (c) Previously documented grants, research contracts, fund raising, or donations likely to reoccur; (d) The lease or rental of tenant occupancies at a location, as furnished and equipped by you;
>
> (2) Continuing normal operating expenses incurred, including your continuing normal payroll expenses;
>
> (3) Charges which are the legal obligation of your tenants but would otherwise be your obligations; and
>
> (4) The fair rental value of any portion of a location occupied by you; that would have been earned or incurred by you had there been no covered loss or damage."

(emphasis in original, indicating specifically defined terms).

84.     "Operations" is defined as "… the usual and customary business activities in the conduct of your business occurring at the location, including the tenability of the premises".

85.     The Policy also defines "extra expense":

> **"Extra expense** means the necessary expenses you incur during the **period of restoration**, over and above the expenses you would have normally incurred had there been no covered loss, in order to:
>
> a.  Avoid or minimize the **suspension** of business and to continue **operations** at the location or at replacement or temporary locations, including relocation expenses and costs to equip and operate such replacement or temporary locations;
>
> b.  Minimize the **suspension** of business if you cannot continue **operations**; or
>
> c.  Repair or replace covered property, but only to the extent it reduces the amount of loss that otherwise would have been payable under Business Income and Extra Expense Coverage."

(emphasis in original, indicating specifically defined terms).

86.     As set forth above, in response to the emergency Orders, which occurred during the policy term, Plaintiffs were forced to slow down (and eventually cease) various business activities, most importantly the provision of on-premises dining and table service.

87.     Plaintiffs thus suffered the actual business income losses and incurred necessary extra expense during the policy term which were caused by the loss of (or alternatively, damage to) their insured property at the covered locations.

88.     Moreover, in addition to the Extensions of Coverage, various specified extensions and coverages are available under the Policy as endorsements, including but not limited to: the Property Gard Restaurants Extension Endorsement, Hospitality Extension Endorsement; further extensions also include a 180 day extension of BI, and additional Extra Expenses, Expediting Expense and Loss Adjustment Coverages.

89.     Plaintiffs' business income losses and incurred extra expenses are insured by the Policy and are not excluded.  Plaintiffs are entitled to payment for these business income losses.

90.     The Policy also provides for various coverage extensions, which provide coverage in tandem or the alternative, including but not limited to: civil authority, delayed occupancy, dependent property, and/or loss adjustment expense.

91.     The Policy includes Civil Authority coverage which means

"a. We will pay for the actual loss of **business** income and necessary **extra expense** you sustain due to the necessary **suspension** of your operations caused by action of civil authority that prohibits access to a **location**. Such prohibition of access to such location by a civil authority must:

(1) Arise from direct physical loss or damage to property other than at such location; and

(2) Be caused by or result from a **covered cause of loss**; and

(3) Occur within the number of miles stated in the Declarations from such **location**"

(emphasis in original, indicating specifically defined terms).

92.     On or after March 26, 2020, Governor Baker issued a Stay At Home Advisory and related Orders permitting activities only for essential businesses and essential employees.

Plaintiffs assert that these actions by Governor Baker pursuant to the Declaration of an Emergency on March 10, 2020 were actions related to business income losses caused by actions by civil authorities within the meaning of the Policy. Such Orders from a civil authority caused Plaintiffs' properties and businesses to be physically uninhabitable and/or substantially unusable by employees and customers. The acts of the civil authorities prohibited customer access to Plaintiffs' business locations, causing Plaintiffs to suffer business income losses and incur necessary extra expenses.

93.     At all relevant times, as a result of the Orders of the civil authorities of the Commonwealth, there are like businesses (to the businesses of the Plaintiffs) within one mile of the Plaintiffs' businesses that were made inaccessible to the public because of such Orders. For like reasons, the plaintiffs' insured properties and restaurant businesses were inaccessible to the insured's employees and customers within the terms and conditions of the Policy.  Such actions of the civil authorities prohibited customer access to Plaintiffs' business locations, causing Plaintiffs to suffer business income losses and incur necessary extra expenses.

94.     The Policy includes Delayed Occupancy Coverage, for business income and extra expense as follows:

> "a. We will pay for the actual loss of **business income** and necessary **extra expense** you sustain due to the necessary delay in starting **operations** during the **period of restoration** arising from direct physical loss or damage to property at a **location** caused by or resulting from a **covered cause of loss**. The **period of restoration** begins immediately after the time that **operations** would have begun if the covered loss or damage had not occurred.
>
> b. If a covered loss occurs under Delayed Occupancy Coverage, then we will also pay for the necessary **soft costs** you incur which are over and above such expense that you would have incurred during the **period of restoration** had there been no loss." (emphasis in original, indicating specifically defined terms).

95.     As described above, the Emergency Orders caused and/or are causing Plaintiffs'

delay in restarting their businesses at various times during the covered period.   As a result,

Plaintiffs suffered business income losses and incurred necessary extra expenses.

96.     Under the coverage extension for "Dependent Property Coverage," the Policy

provides, in relevant part:

> "a.     Dependent Property Coverage
>
> (1)     We will pay for the actual loss of **business income** and
>         necessary **extra expense** you sustain due to the necessary
>         **suspension** of **operations** during the **period of restoration** at a
>         **location**.
>
> (2)     The **suspension** must be due to direct physical loss or damage
>         at the **location** of a **dependent property**, situated inside or
>         outside of the Coverage Territory, caused by or resulting from a
>         **covered cause of loss**."

(emphasis in original, indicating specifically defined terms).

97.     The Policy defines "dependent property" in relevant part as "property operated by

others upon whom you depend to…. [d]eliver materials or services to you [or] [a]ttract customers

to your business."

98.     As described above, Governor Baker's Order and Advisories prevented Plaintiffs'

employees and customers from utilizing Plaintiffs' properties and restaurant businesses. This

action by Massachusetts civil authorities caused Plaintiffs to suffer business income losses and

incur necessary extra expenses from the slow down and/or cessation of various business activities.

99.     Further, as described above, the emergency Orders resulted in loss or damage to

many other properties that attract customers to Plaintiffs' business, including but not limited to:

nearby educational and recreational facilities.

100.    Under the coverage extension for "Loss Adjustment Expense Coverage," the Policy

provides, in relevant part:

"a. If covered loss or damage occurs under this Coverage Form, then we will pay the necessary loss adjustment expenses you incur that would not have been incurred had there not been a covered loss. Loss adjustment expenses include but are not limited to:

(1)     Extra wages paid to your employees for preparing inventories;

(2)     Expenses incurred to document your **business income** loss or **extra expense** sustained;

(3)     Public Accountant or Certified Public Accountant fees;

(4)     The cost of appraisals; or

(5)     Other expenses incurred to obtain loss data in support your claim or to complete your proof of loss."

(emphasis in original, indicating specifically defined terms).

101.    As described above, Plaintiffs have incurred and will incur such expenses during the covered time period, and would not have incurred these expenses had there been no emergency Orders.

**VIII.    The Arbitrary Denial of Plaintiffs' Claims**

102.    On March 16, 2020, Plaintiffs provided their first notice of loss to Defendants and showed it had suffered business income losses and incurred expenses during the policy term.

103.    On July 23, 2020, Defendants denied the claim without any meaningful or honest investigation of the facts or contractual terms.  See Exhibit B.

104.    Defendants summarily and arbitrarily asserted that the Plaintiffs' losses were not caused from direct physical loss of or damage to covered property, but provided no basis therefore.

105.    Defendants summarily and arbitrarily did not adjust potential losses under the Policy coverages.

106.     Without reasonable investigation, Defendants made summary coverage determinations as to the inapplicability of civil authority coverage, crisis event coverage, off-premises special event coverage, but provided no basis for their factual conclusions.

107.     The losses Plaintiffs suffered are insured losses under the Policy, but Defendants have denied coverage despite Plaintiffs' timely notice of their claim.

108.     Defendants have breached the Policy and other lawful duties by failing and refusing to adjust Plaintiffs' claims under applicable coverages, and by refusing to promptly pay Plaintiffs' business income losses and claims.

109.     Defendants were obligated under the Policy to cover and pay Plaintiffs' losses and extra expenses but have failed and refused to do so.

## COUNT I

## **BREACH OF CONTRACT**

## **All Plaintiffs v. All Defendants**

110.     Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

111.     Plaintiffs purchased a commercial property insurance policy from the Defendants.

112.     Plaintiffs have performed all obligations as specified by the Policy including the payment of all premiums due.

113.     Plaintiffs' Policy provides coverage for business income losses, extended business income loss, and extra expenses.

114.     Plaintiffs have suffered direct physical loss of and/or damage to their insured properties at the covered locations, which was caused by or resulted from the emergency Orders described herein.

115.     This direct physical loss of and/or damage to their insured properties caused the necessary slowdown or cessation of Plaintiffs' business activities, resulting in business income losses.

116.     The Policy provides that the Defendants will pay for any necessary expenses that Plaintiffs incur that they would not have incurred had there been no physical loss or damage to their insured property.

117.     Plaintiffs suffered losses of business income and incurred extra expenses from a covered causes of loss within the meaning of the Policy.

118.     Defendants breached the Policy when they denied Plaintiffs' covered claims, and failed to issue proper payment for the Plaintiffs' suffered losses and extra expenses.

119.     Defendants are in breach of the Policy by refusing to adjust potential losses under other potentially applicable coverages, such as those provided under the Property Gard Restaurant Extension, Hospitality Industry Coverage Extensions endorsements and/or Civil Authority coverage.

120.     As a result of the Defendants' breach of the insurance policies, Plaintiffs have suffered actual damages.

**WHEREFORE**, Plaintiffs demand compensatory damages resulting from the Defendants' breach of contract and further seek all relief deemed appropriate by this Court, including attorneys' fees, interest as provided by G. L. c. 231, § 6C, and costs.

**COUNT II**

**<u>BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING</u>**

**<u>All Plaintiffs v. All Defendants</u>**

121.    Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

122.    In the Commonwealth, the Defendants are bound by the implied contractual covenant of good faith and fair dealing.

123.    The Defendants did violate the covenant of good faith and fair dealing.

**WHEREFORE**, Plaintiffs demand compensatory damages resulting from the Defendants' breach of covenant of good faith and fair dealing, and further seek all relief deemed appropriate by this Court, including attorney's fees, interest as provided by G. L. c. 231, § 6C,  and costs.

### COUNT III

### <u>VIOLATION OF G. L. c. 176D</u>

### <u>All Plaintiffs v. All Defendants</u>

124.    Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

125.     The Defendants conduct as alleged herein violates, *inter alia*, the provisions of G. L. c. 176D, § 9.

**WHEREFORE**, Plaintiffs demand compensatory damages resulting from the Defendants' breach of contract and further seek all relief deemed appropriate by this Court, including attorney's fees, interest as provided by G. L. c. 231, § 6C, punitive damages and costs.

### COUNT IV

### <u>All Plaintiffs v. All Defendants</u>

### <u>VIOLATION OF G. L. c. 93A</u>

126.    Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

127.    The Defendants are engaged in trade or business in the Commonwealth within the meaning of G. L. c. 93A, § 11.

128.    The Defendants' conduct as alleged herein constitute knowing unfair and deceptive acts and practices in violation of G. L. c. 93A, the Attorney General's regulations, and G. L. c. 176D.

**WHEREFORE**, Plaintiffs demand compensatory damages resulting from the Defendants' breach of contract and further seek all relief deemed appropriate by this Court, including attorneys' fees, interest as provided by G. L. c. 231, § 6C, punitive damages and costs.

## DEMAND FOR A JURY TRIAL

Plaintiffs request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted,
Attorney for Plaintiffs

/s/ Jonathan T. Merrigan
J. TUCKER MERRIGAN, BBO # 681627
PETER M. MERRIGAN, BBO # 673272
THOMAS T. MERRIGAN, BBO # 343480
**SWEENEY MERRIGAN LAW, LLP**
268 Summer Street, LL
Boston, Massachusetts 02210
Tel.:    617-391-9001
Fax:    617-357-9001
tucker@sweeneymerrigan.com
peter@sweeneymerrigan.com
tom@sweeneymerrigan.com

And

/s/ Allan Kanner
Allan Kanner, Esq. (*pro hac vice* forthcoming)
Cynthia St. Amant, Esq. (*pro hac vice* forthcoming)
**KANNER & WHITELEY, LLC**
701 Camp Street
New Orleans, LA 70130
Tel: (504) 524-5777

Fax: (504) 524-5763
a.kanner@kanner-law.com
c.stamant@kanner-law.com